# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE GEO GROUP, INC.,

*Plaintiff - Appellee,*

v.

JAY INSLEE, Governor; ROBERT FERGUSON,

*Defendants - Appellants.*

No. 24-2815

D.C. No.
3:23-cv-05626-BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted February 14, 2025
Seattle, Washington

Filed August 19, 2025

Before: William A. Fletcher, Ronald M. Gould, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## Intergovernmental Immunity / Preemption

The panel (1) vacated the district court's grant of a preliminary injunction sought by GEO Group, Inc. ("GEO") against Washington's Governor and Attorney General, preventing the enforcement of Sections 2, 3, 5 and 6 of House Bill 1470 ("HB 1470"), a Washington law that protects the health and safety of civil detainees held in the Northwest Immigration and Customs Enforcement Processing Center ("NWICP"); and (2) granted in part GEO's motion to remand to the district court for further proceedings.

GEO owns and operates the NWIPC, a private, for-profit detainment facility in Washington State that confines noncitizen civil detainees while their immigration status is determined. GEO sought a preliminary injunction against the enforcement of several provisions of HB 1470: Section 2, which requires Washington's Department of Health ("DOH") to adopt rules to ensure that private detention facilities provide sanitary, hygienic, and safe conditions for detained persons; Section 3, which provides that DOH shall conduct routine, unannounced inspections of private detention facilities; Section 5, which provides to a detained person a private cause of action for monetary and injunctive relief for a violation of HB 1470; and Section 6, which provides that any person who fails to comply with HB 1470 may be subject to a civil penalty. The district court held that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

these sections violate the doctrine of intergovernmental immunity and granted a preliminary injunction against their enforcement.

After oral argument in this case, HB 1232—which made several changes to HB 1470—was passed. The panel held that although HB 1232 affects some of the issues on appeal, the appeal is not moot.

The panel held that GEO's challenges to HR 1470, as amended by HR 1232, constitute a case or controversy within the meaning of Article III. GEO alleged sufficient injury in fact to bring a pre-enforcement challenge to Section 2 and relevant enforcement-related provisions of Sections 3 and 6 of HB 1470, as well as relevant provisions of HB 1232. Because no rules have yet been adopted implementing Section 2, as amended by HB 1232, GEO's pre-enforcement challenge is limited to the question of whether GEO has shown a sufficient likelihood that DOH will adopt such rules to justify a preliminary injunction.

Addressing GEO's argument Sections 2, 3, and 6 are invalid under the intergovernmental immunity doctrine— which generally immunizes the federal government from state laws that directly regulate and discriminate against it— the panel held that Section 2 does not regulate the federal government directly in violation of the intergovernmental immunity doctrine. Addressing whether Sections 2 and 3 of HB 1470 were impermissible discriminatory regulations, the panel held that it would not decide at this point whether Washington regulates the conditions of confinement at the NWIPC differently from the way it regulates the conditions of confinement in other civil detention facilities. Because the district court incorrectly concluded that the appropriate comparator was Washington's prisons, the panel remanded

to allow the district court to make the comparison with other civil detention facilities. The panel vacated the district court's decision to strike Section 6 as unconstitutional because it was premised on a comparison to Washington's prisons rather than the private civil detention facilities, and remanded to allow the district court to make the appropriate comparison.

The panel agreed with the district court that Sections 2, 3, and 6 of HB 1470 were not preempted by federal law. Under field preemption, the panel saw no clear indication that Congress had demonstrated any intent to preempt Sections 2, 3, and 6 of HB 1470 and relevant portions of HB 1232. Under obstacle preemption, the panel held that HB 1470 did not present an unconstitutional obstacle to the accomplishment of the government's standards for the conditions of alien detention.

Finally, the panel held that the district court erred in reaching the merits of GEO's challenge to Section 5 because this section provides no cause of action against either the Washington Attorney General or Governor. Rather than enjoining enforcement of Section 5 by the Attorney General and the Governor, the district court should have dismissed this portion of GEO's suit.

## COUNSEL

Dominic E. Draye (argued) and Christopher M. O'Brien, Greenberg Traurig LLP, Phoenix, Arizona; John Hodges-Howell, Harry J.F. Korrell, Davis Wright Tremaine LLP, Seattle, Washington; Scott Schipma, The GEO Group Inc., Boca Raton, Florida; for Plaintiff-Appellee.

Marsha J. Chien (argued) and Cristina Sepe, Deputy Solicitors General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Olympia, Washington; Andrew R.W. Hughes and Ellen E. Range, Assistant Attorneys General, Office of the Washington Attorney General, Seattle, Washington; for Defendants-Appellants.

Bradley Hinshelwood (argued) and Mark B. Stern, Attorneys, Appellate Staff, Civil Division; Tessa M. Morgan, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C., for Amicus Curiae United States.

Hannah Woerner, Columbia Legal Services, Olympia, Washington, for Amici Curiae La Resistencia and Professor Angelina Snodgrass Godoy.

Aaron Korthuis, Matt Adams, Leila Kang, and Glenda A. Madrid, Northwest Immigrant Rights Project, Seattle, Washington, for Amicus Curiae Northwest Immigrant Rights Project.

Andrew L. Schlafly, Far Hills, New Jersey, for Amicus Curiae Immigration Reform Law Institute.

Anastasia R. Sandstrom, Senior Counsel, Office of the Washington Attorney General, Seattle, Washington; Eric Sonju, Senior Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae Department of Health and Department of Labor and Industries.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff-Appellee the GEO Group ("GEO") owns and operates a private, for-profit detainment facility, the Northwest Immigration and Customs Enforcement Processing Center ("NWIPC"), in Washington State. The NWIPC confines noncitizen civil detainees while their immigration status is determined. GEO obtained a preliminary injunction against the Defendants-Appellants, then-Governor Jay Inslee and then-Attorney General Robert Ferguson (together, "Washington"), preventing enforcement of several provisions of House Bill 1470 ("HB 1470"), a Washington law that protects the health and safety of the civil detainees held in the NWIPC. We vacate and remand.

## I. Background

GEO operates detainment facilities and private prisons throughout the country under contracts with the federal government. In 2024, GEO had $2.42 billion in total revenue and a net income of $31.9 million. *The GEO Group Reports Fourth Quarter and Full Year 2024 Results,* The GEO Group, Inc. (Feb. 27, 2025), https://investors.geogroup.com/news-releases/news-release-details/geo-group-reports-fourth-quarter-and-full-year-2024-results.

GEO operates the NWIPC in Tacoma, Washington, under a contract with Immigration and Customs Enforcement ("ICE"). The NWIPC is the only immigration detention facility in Washington. Persons held at the NWIPC are civil detainees, awaiting administrative review of their immigration status. Some detainees lack legal status

in the United States.  Others are lawful permanent residents, some with work authorization.  Detainees are held until they are either deported or released into the United States.

As described in more detail below, the relevant provisions of Washington's HB 1470, as amended by HB 1232 in May 2025, require the NWIPC to provide nutritious food in a clean and safe facility, authorize inspections related to these requirements, and authorize a monetary penalty for violations.  The question before us is whether these provisions are consistent with federal law.

A.  Predecessors to HB 1470 and HB 1232

In 2020, the Washington legislature passed two related statutes.

First, the legislature passed Senate Bill 6442. S.B. 6442, 66th Leg., Reg. Sess. (Wash. 2020), *enacted as* 2020 Wash. Sess. Laws ch. 318.  The statute prohibited Washington's Department of Corrections ("DOC") from contracting with private prisons for placement or transfer of state prisoners except in emergencies.  Wash. Rev. Code § 72.68.110(1). The legislature passed the statute after finding that "profit motives lead private prisons to cut operational costs, including the provision of food, health care, and rehabilitative services."  2020 Wash. Sess. Laws ch 318, § 1(2).

Second, the legislature passed House Bill 2576. H.B. 2576, 66th Leg., Reg. Sess. (Wash. 2020), *enacted as* 2020 Wash. Sess. Laws ch. 284.  That statute instructed Washington's Department of Health ("DOH") to evaluate and report on private detention facilities in Washington State.  The statute provided that "all people confined in prisons and detention facilities in Washington deserve basic

health care, nutrition, and safety, regardless of whether those people are confined in publicly or privately operated facilities." *Id.* § 1. DOH finished its report in November 2020. The report noted that "private detention centers are not all the same. Detainee and advocate complaints are almost exclusively associated with the [NWIPC]. This facility is [the] state's only privately operated, adult immigration detention center."

In 2021, based on the findings in the DOH report, the Washington Legislature passed House Bill 1090. H.B. 1090, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 30. The statute prohibited the operation of any "private detention facility within the state." Wash. Rev. Code § 70.395.030. After our court's en banc decision in *GEO Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022), which invalidated a similar law passed in California, Washington stipulated that it would not enforce HB 1090 against GEO's operation of the NWIPC. *See GEO Group, Inc. v. Inslee*, 702 F. Supp. 3d 1043, 1046 (W.D. Wash. Nov. 16, 2023).

## B. HB 1470

In 2023, in the wake of *Newsom*, the Washington legislature passed House Bill 1470. H.B. 1470, 68th Leg. Reg., Sess. (Wash. 2023), *enacted as* 2023 Wash. Sess. Laws ch. 419. In enacting HB 1470, the Washington legislature found

> that all people confined in prisons and detention facilities in Washington deserve basic health care, nutrition, and safety. As held in *United States v. California*, 921 F.3d 865, 886 (9th Cir. 2019), states possess "the

> general authority to ensure the health and welfare of inmates and detainees in facilities within its borders." States have broad authority to enforce generally applicable health and safety laws against contractors operating private detention facilities within the state. The [N]inth [C]ircuit reinforced this authority in *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022), stating "[p]rivate contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself."

Wash. Rev. Code § 70.395.010. Four sections of HB 1470 are at issue in this appeal.

## C.  HB 1232

On May 12, 2025, after we heard oral argument in this case, now-Governor Ferguson signed Second Substitute House Bill 1232 ("HB 1232"). *See* Engrossed Second Substitute H.B. 1232, 69th Leg., Reg. Sess. (Wash. 2025). HB 1232 makes several but, in the context of this case, largely nonmaterial changes to HB 1470.

## D.  The Present Suit and Appeal

In July 2023, GEO filed a complaint in federal district court against Washington, seeking declaratory and injunctive relief against the enforcement of HB 1470. As relevant to this appeal, GEO challenged Sections 2, 3, 5 and 6 of HB 1470. The district court concluded that it "ha[d] subject-matter jurisdiction to consider GEO's constitutional challenges to Sections 2, 3, 5, and 6 of HB 1470." The court

held that all of these sections violate the doctrine of intergovernmental immunity and granted a preliminary injunction against their enforcement. Washington timely appealed.

### E. Motion by GEO

After the passage of HB 1232, GEO moved in this court for a dismissal of the current appeal and a remand to the district court on the ground that changes to HB 1470 wrought by HB 1232 mooted the appeal. Washington opposed the motion on the ground that the changes are relatively minor and that the substance of the appeal remains properly pending in this court.

We agree with GEO that HB 1232 affects some of the issues on appeal. However, we disagree with GEO's conclusion that we should dismiss the appeal as moot. Although "the repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal," that presumption is rebutted when the legislative change results in a law that is "substantially similar" to the challenged legislation. *Bd. of Trs. Of Glazing Health & Welfare Tr.*, 941 F.3d 1195, 1198 (9th Cir. 2019). We conclude that HB 1232's changes have resulted in a law that is "substantially similar" to HB 1470's initial text, and that this appeal is therefore not moot. *Cf. Teter v. Lopez*, 125 F.4th 1301, 1307 (9th Cir. 2025) (en banc) (finding appeal moot after legislative changes when the defendant "ha[d] ceased to enforce the challenged law because it no longer exist[ed]"). Most of the questions presented to us remain largely unchanged by HB 1232.

We deny GEO's motion in part and grant in part. We decide some questions now. We remand other questions to the district court.

## II.  Jurisdiction and Standard of Review

We have jurisdiction over interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions[.]"  28 U.S.C. § 1292(a)(1).  We review the grant or denial of a preliminary injunction for abuse of discretion.  *See Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018).  We review underlying legal issues de novo "because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law."  *Id.* (internal quotation marks omitted) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000)).

## III.  Preliminary Injunctive Relief

To obtain a preliminary injunction, a plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' we need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (2018) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).

## IV.  Discussion

### A.  Sections 2, 3, and 6 of HB 1470 and Relevant Provisions of HB 1232

Section 2 of HB 1470 requires Washington's DOH to "adopt rules as may be necessary to . . . ensure private detention facilities comply with measurable standards providing sanitary, hygienic, and safe conditions for

detained persons." Wash. Rev. Code § 70.395.040(1). Section 2 provides that Washington's Attorney General "may enforce violations of this section on its own initiative or in response to complaints or violations." *Id.* § 70.395.040(2). DOH has not yet adopted regulations under Section 2. HB 1232 modifies Section 2 in minor respects.

Section 3 of HB 1470 provides that DOH "shall . . . [c]onduct routine, unannounced inspections of private detention facilities including, but not limited to, inspection of food services and food handling, sanitation and hygiene, and nutrition[,]" and shall "[c]onduct investigations of complaints received relating to any private detention facility located within the state." Wash. Rev. Code § 70.395.050(1)(a)–(1)(b) (now § 70.395.05(2)(a)–(2)(b)). Section 3 further provides that Washington's Department of Labor and Industries "shall conduct routine, unannounced inspections of workplace conditions at private detention facilities, including work undertaken by detained persons." *Id.* § 70.395.050(4) (now § 70.395.050(5)). The Office of Washington's Attorney General "may enforce violations of this section on its own initiative or in response to complaints of violations." *Id.* § 70.395.050(5) (now § 70.395.050(6)). HB 1232 does not affect any of the issues presented to us under Section 3.

Section 6 of HB 1470 provides that "[a]ny person who fails to comply" with HB 1470 "may be subject to a civil penalty in an amount of not more than $1,000 per violation per day." *Id.* § 70.395.080(1). Section 4 of HB 1232 provides a "civil fine of up to $10,000 per violation, not to exceed a total fine of $1,000,000, on a private detention facility" under certain circumstances. H.B. 1232 § 4.

### 1. Article III Case or Controversy

We first address the question whether GEO's challenges to HR 1470, as amended by HR 1232, constitute a case or controversy within the meaning of Article III. The district court concluded that they do constitute a case or controversy. We agree.

Washington contends that because DOH has not yet adopted implementing rules for Section 2 (now including amendments contained in HB 1232), GEO has not yet suffered an injury in fact. Washington contends that GEO's pre-enforcement challenge to Section 2 and relevant enforcement-related portions of Sections 3 and 6 (and now relevant portions of HB 1232) is therefore unripe under Article III. We regard Washington's contention as equivalent to a contention that GEO lacks Article III standing. We wrote in *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted), a pre-enforcement injury case:

> Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional case or controversy, that the issues presented are definite and concrete, not hypothetical or abstract. In assuring that this jurisdictional prerequisite is satisfied, we consider whether the plaintiffs face a realistic danger of

>sustaining a direct injury as a result of the
>statute's operation or enforcement.

*See also Newsom*, 50 F.4th at 753 ("Whether framed as standing or ripeness, California's injury requirements 'boil down to the same question.'" (citation omitted)).

"Pre-enforcement injury is a special subset of injury-in-fact." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). We have "adopt[ed] the Supreme Court's framework" for determining whether a plaintiff bringing a pre-enforcement challenge has satisfied Article III's injury-in-fact requirement. *Id*. That test requires the plaintiff to show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

GEO is already required, pursuant its contract with the government, to comply with Performance-Based National Detention Standards ("PBNDS") in its operation of the NWIPC. It contends that Section 2 will impose additional requirements. Before the passage of HB 1232, GEO contended that rules implementing Section 2 will require it to change the existing heating and cooling air conditioning system in the NWIPC; to provide exclusively fresh fruits and vegetables, whereas the PBNDS requires fresh fruits and vegetables only in specific situations; and to provide a list of specified personal toiletries to detainees on a regular basis, whereas the PBNDS does not require the provision of one of such toiletries. HB 1232 makes clear that the NWIPC is not required to provide exclusively fresh fruits and vegetables; it is now required to provide a "balanced diet, *including* fresh

fruits and vegetables." (Emphasis added.) However, the heating and cooling, as well as the personal toiletries, issues remain.

We conclude that GEO has alleged sufficient injury in fact to bring a pre-enforcement challenge to Section 2 and relevant enforcement-related provisions of Sections 3 and 6 of HB 1470, as well as relevant provisions of HB 1232. We recognize that DOH has not yet adopted rules implementing Section 2, as amended by HB 1232. But it is clear that DOH intends to adopt such rules, and that, once adopted, DOH intends to enforce them against GEO. GEO contends that there is a likelihood that such rules will require it to make the changes described above. GEO contends that requiring such changes will violate the doctrine of intergovernmental immunity, and, further, that such changes will be preempted by federal law. Because no rules have yet been adopted implementing Section 2, as amended by HB 1232, GEO's pre-enforcement challenge is limited to the question whether GEO has shown a sufficient likelihood that DOH will adopt such rules to justify a preliminary injunction.

## 2. Challenges to Sections 2, 3, and 6 of HB 1470 and Relevant Provisions of HB 1232

GEO argues, first, that Sections 2, 3, and 6 of HB 1470 are invalid under the doctrine of intergovernmental immunity, and, second, that they are preempted. We apply its argument to relevant provisions of HB 1232 as well. (For convenience from this point on, when we refer to sections of HB 1470 we also refer to relevant provisions contained in HB 1232 unless otherwise indicated.)

### a. Intergovernmental Immunity

"[I]ntergovernmental immunity attaches only to state laws that discriminate against the federal government and burden it in some way." *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019). Because federal contractors are not the federal government, "states may impose some regulations on federal contractors that they would not be able to impose on the federal government itself." *Newsom*, 50 F.4th at 760 n.10. "If the immunity of federal contractors is to be expanded beyond its narrow constitutional limits, it is Congress that must take responsibility for the decision, by so expressly providing as respects contracts in a particular form, or contracts under particular programs." *United States v. New Mexico*, 455 U.S. 720, 737 (1982) (citing *James v. Dravo Contracting Co.*, 302 U.S. 134, 161 (1937)).

"The Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that [1] directly regulate or [2] discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (2022) (bracketed numbers added). We address in turn these two ways in which a state law can be invalid under the intergovernmental immunity doctrine.

### i. Direct Regulation

In the portion of its brief arguing that HB 1470 is an impermissible direct regulation, GEO focuses only on the requirements of Section 2. GEO does not make separate arguments directed to the inspection and enforcement provisions in Sections 3 and 6. Based on the manner in which GEO has made its arguments, we conclude that GEO's objections to Sections 2, 3 and 6 based on direct regulation stand or fall based on its arguments about the validity of Section 2.

The district court held that Section 2 "does not regulate the federal government directly in violation of the intergovernmental immunity doctrine." We agree.

A state has greater ability to regulate a contractor of the federal government than to regulate the government itself. As we wrote in *Newsom*, "The scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." *Newsom*, 40 F.4th at 755.

GEO relies on three cases in particular to support its argument that HB 1470 is impermissible direct regulation.

First, GEO relies on our en banc decision in *Newsom*. GEO characterizes AB 32, the California statute at issue in that case, as "similar" to HB 1470. It writes that HB 1470 was adopted "for the express purpose of circumventing this Court's en banc decision in *Newsom*," suggesting that *Newsom* requires us to hold that HB 1470 is discriminatory.

It is true that HB 1470 was enacted after it became clear that AB 32 was unconstitutional under our holding in *Newsom*. But it is also true that HB 1470 was specifically designed to avoid the unconstitutional aspects of AB 32. HB 1470 is poles apart from AB 32. AB 32 flatly forbade the operation in California of private detention facilities operating under contract with the federal government. In contrast to AB 32, HB 1470 permits the operation of private detention facilities such as the NWIPC in Washington. Further, in holding AB 32 invalid in *Newsom*, we emphasized the extraordinary degree of direct control over federal operations authorized by AB 32:

> AB 32 would override the federal government's position, pursuant to discretion

> conferred by Congress, to use private contractors to run its immigration detention facilities. It would give California a "virtual power of review" over ICE's detention decisions, and allow the 'discretion of the federal officers [to] be exercised . . . only if the [state] approves.'

*Id.* at 751 (citations omitted). No such control is authorized in HB 1470.

Contrary to GEO's argument, *Newsom* supports rather than undermines the decision we reach here. It is undisputed that the purpose and effect of HB 1470 is to protect the health and safety of detainees in the NWIPC. Our opinion in *Newsom* explicitly recognized the authority of a state to protect the health and safety of those within its borders:

> States's historic police powers include regulation of health and safety. And these historic powers extend to laws regulating health and safety in federal detention facilities located within a state.

*Id.* at 766 (citations omitted). *See also California*, 921 F.3d at 886 (states have "the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders").

Second, GEO relies on *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), contending that the facts there are "remarkably similar" to the facts here. In *Movassaghi*, a California statute required a "responsible party" to "take or pay for appropriate removal or remedial action" at a particular site in California that had been heavily polluted.

*Id.* at 839. The federal government accepted responsible-party status at that site and recognized that, as the responsible party, it was required under state law to clean up the site. The federal government "actively conduct[ed] the cleanup through its cleanup contractor, Boeing." *Id.* at 839.

The California statute imposed higher clean up standards and costs on the government than the clean-up standards and costs imposed by federal law. We struck down the California statute, holding that it directly, and therefore impermissibly, regulated the federal government as a responsible party. In *Newsom*, we characterized the statute at issue in *Movassaghi* as "impermissibly interfer[ing] with federal functions by overriding federal contracting decisions" rather than "merely increas[ing] the federal government's costs." *Newsom*, 50 F.4th at 760.

The case before us is not controlled by *Movassaghi*. First, and most important, the statute in *Movassghi* imposed an obligation directly on the federal government. HB 1470 imposes no obligation on the federal government. Instead, it imposes obligations on GEO, a federal *contractor*. Second, unlike the statute in *Movassaghi*, HB 1470 does not "impermissibly" "overrid[e] federal contracting decisions." *Id.* Many, perhaps all, of the obligations imposed by Section 2 are already imposed by the federal government itself, through GEO's contract with ICE. The contract explicitly orders GEO to comply with obligations imposed under state law, even when those obligations are more demanding than those imposed under federal law:

> All services [at the NWIPC] must comply with . . . all applicable federal, state, and local laws and standards. Should a conflict exist

> between any of these standards, the most
> stringent shall apply.

Finally, HB 1470 does not increase the federal government's costs. Under GEO's contract with the government, any increased costs are borne by GEO, not by the government.

Third, after briefing was completed in this appeal GEO brought to our attention *United States v. King County, Washington*, 122 F.4th 740 (9th Cir. 2024), in support of its position. In *King County*, the government had challenged a county executive order that forbade companies at Boeing Field, a small airport just south of Seattle, from providing essential services such as fueling to flights chartered by Immigration and Customs Enforcement ("ICE"). We held that the order violated intergovernmental immunity on two grounds. First, the order "forc[ed] ICE either to stop using Boeing Field or to use government-owned planes there." *Id.* at 756. Second, the order "'singl[ed] out' the federal government and its contractors for unfavorable treatment,' . . . 'burdening federal operations, and *only* federal operations.'" *Id.* at 757.

*King County* is very different from the case before us. First, unlike in *King County*, nothing in Washington law results in the federal government being unable to use contractors in the State. HB 1470 does not seek to shut down the NWIPC; nor does it limit ICE's ability to detain any individual in the NWIPC. Through the passage of HB 1470, Washington seeks only to change the way GEO treats its detainees. Second, unlike in *King County*, Washington has not "singled out" the NWIPC for unfavorable treatment. As we will discuss in a moment, Washington law regulates two types of residential treatment facilities, in which people are

held in involuntary civil confinement, in a very similar—perhaps identical—fashion.

In sum, Section 2 does not "require[] ICE to entirely transform its approach to detention in the state or else abandon its [Washington] facilities." *Newsom*, 50 F.4th at 750. It does not give Washington "'virtual power of review' over ICE's detention decisions." *Id.* at 751. Nor does it "prevent ICE's contractors from continuing to run detention facilities." *Id.* at 750. We thus conclude that while Section 2 of HB 1470 does regulate GEO, it does not directly regulate the federal government.

### ii. Discriminatory Regulation

#### (a) Sections 2 and 3 of HB 1470 and Relevant Provisions of HB 1232

In the portion of its brief arguing that HB 1470 is an impermissible discriminatory regulation, GEO again focuses on the requirements of Section 2. It does not make a separate argument directed to the inspection or enforcement provisions in Sections 3. Based on the manner in which GEO has made its arguments, we conclude that GEO's objections to Sections 2 and 3 of HB 1470 based on discriminatory regulation stand or fall based on its arguments about the validity of Section 2. We address Section 6 in a separate subsection.

A state law or regulation impermissibly discriminates against the federal government if it treats a state entity more favorably than it treats a comparable federal entity. *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019). The "important consideration" is whether the state has "singled out contractors who work for the United States for discriminatory treatment." *Washington v. United States*, 460

U.S. 536, 544, 546 (1983).  A state law or regulation that burdens only a federal contractor is not impermissibly discriminatory if it "duplicate[s] requirements otherwise mandated under" state law that are imposed on similarly situated state contractors.  *California*, 921 F.3d at 873; *see also Washington v. United States*, 460 U.S. at 541 (sales tax that applied only to federal contractors did not violate intergovernmental immunity because "Washington . . . impose[s] a sales tax on all purchases from contractors who do not deal with the Federal Government").

HB 1470 is written in general terms, applying to "for-profit prisons and detention facilities in the state."  However, the NWIPC is the only such detention facility in Washington.  Thus, as a practical matter, HB 1470 applies only to the NWIPC.  The fact that HB 1470 applies only to the NWIPC does not, by itself, mean that it violates the intergovernmental immunity doctrine. *See Washington*, 460 U.S. at 541–45 (rejecting argument that statute specifically targeting federal contractors was discriminatory solely on that basis); *id.* at 540 (citing *United States v. Mexico*, 455 U.S. 720, 734 (1982) ("[I]mmunity may not be conferred simply because" the law "has an effect on the United States, or even because the Federal Government shoulders the entire economic burden.")).  To determine whether HB 1470 is impermissibly discriminatory, we evaluate how Washington law treats entities that are "similarly situated" to GEO. *Dawson*, 586 U.S. at 177.  If Washington law treats similarly situated entities in the same manner HB 1470 treats the NWIPC, HB 1470 is not impermissibly discriminatory.

The key issue in this case is whether the entities to which we should compare the NWIPC are state prisons or civil detention facilities.  For the reasons explained below, we

conclude that the appropriate comparators are civil detention facilities.

The district court held that Section 2 impermissibly discriminates against the federal government because it "impose[s] various burdens on the NWIPC that do not apply to any similarly situated facility in the State." The court concluded that the "similarly situated facilit[ies] in the State" are Washington's state-owned and state-operated prisons rather than private residential treatment facilities and civil commitment facilities (collectively, "civil detention facilities") in Washington. Using Washington's prisons as the comparator, the district court concluded that Section 2 is impermissibly discriminatory.

GEO has consistently contended that the entities to which the NWIPC should be compared are Washington's prisons. In agreeing with GEO, the district court relied in substantial part on our decision in *California.* The district court wrote, "[T]he court [in *California*] implicitly reasoned that immigration detention facilities are similarly situated to state and local detention facilities, such as prisons and jails." If the district court had been correct in concluding that the appropriate comparator is Washington's prisons, we would agree with its decision striking down Sections 2 and 3 of HB 1470. However, we disagree with that conclusion.

In *California*, we compared California's treatment of civil immigration detention facilities, on the one hand, to its treatment of California detention facilities that held convicted criminals and those charged with crimes, on the other. We were not asked to compare California's regulation of civil immigration facilities to its regulation of civil detainment facilities. Because we "decide only questions presented by the parties," *United States v. Sineneng-Smith*,

590 U.S. 371, 376 (2020), and because of the fundamental difference between civil detainees and those charged or convicted with crimes, we decline to hold that our comparison in *California* controls here. Now properly presented with the question, we therefore decide whether the appropriate comparison in this case is to private facilities holding civil detainees or to the public prisons and jails holding convicted criminals and those charged with crimes.

GEO has consistently argued that the appropriate comparator to the NWIPC is Washington's prisons. In arguing that prisons are the appropriate comparator, GEO asks us to ignore the critical fact that inmates in Washington's prisons have been convicted of crimes, and that the conditions of their confinement are part of a penal regime. By contrast, none of the detainees held in the NWIPC has been convicted of—or even charged with—a crime. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (Immigration detention is "civil, not criminal" and "nonpunitive in purpose and effect."); *Mahler v. Eby*, 264 U.S. 32, 39 (1924) ("It is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment."). All of the detainees in the NWIPC are civil detainees, awaiting determination of their immigration status. As we noted above, some of the detainees will be deported based on that determination. Some will be released into the United States. GEO also asks us to ignore the fact that Washington owns and operates its prisons. By contrast, the federal government neither owns nor operates the NWIPC. Rather, the NWIPC is owned and operated by GEO, a private, for-profit company. Because of the fundamental differences between Washington's prisons, which are state-owned and state-operated facilities that hold and punish convicted criminals, and the NWIPC, which is a

privately owned and privately operated detention facility that holds civil detainees, we conclude that the appropriate comparator is not Washington's prisons.

Washington has consistently argued that the entities to which the NWIPC should be compared are privately owned and operated civil detention facilities. Like the civil detainees in the NWIPC, many of the individuals in these facilities are held in involuntary confinement. *See, e.g.*, Wash. Rev. Code §§ 71.05.010–71.05.950 (Washington's Involuntary Treatment Act); *id.* § 11.130.330(7) (recognizing that facilities can involuntarily detain individuals consistent with Washington's Involuntary Treatment Act); *id.* § 10.77.150(4) (allowing courts to grant "conditional release of [a] person to a less restrictive alternative, including residential treatment" facilities); and *id.* §§ 9.94A.660, 9.94A.664 (allowing courts to issue sentences "conditioned on the offender entering and remaining in a residential substance use disorder treatment program," *id.* § 9.94A.664(1)(a)). Also like the civil detainees in the NWIPC, individuals confined in these facilities are not confined because they have committed crimes, and the conditions of their confinement are not part of any punishment. *See, e.g.*, *Addington v. Texas*, 441 U.S. 418, 428–30 (1979) (explaining the fundamental differences between criminal and civil commitments, including that '[i]n a civil commitment state power is not exercised in a punitive sense"). We therefore agree with Washington that the appropriate comparators to the NWIPC are these civil detention facilities.

Section 2 sets forth required conditions of confinement for detainees held in the NWIPC. As noted above, DOH has not yet adopted rules implementing those requirements. However, even before implementing rules have been

adopted by DOH, it is evident that the statutory and contractual requirements imposed on the NWIPC are almost identical to the requirements imposed under Washington law on the two types of civil detention facilities to which we compare them. *See California*, 921 F.3d at 882–84. We describe in turn the required conditions of confinement in these three facilities.

First, Section 2 requires DOH to adopt rules implementing its requirements that the NWIPC (1) maintain a "safe, clean, and comfortable environment that allows a detained person to use the person's personal belongings to the extent possible"; (2) clean and sanitize living areas "regularly"; (3) "provide laundry facilities"; (4) provide "[b]asic personal hygiene items . . . at no cost"; (5) "provide a nutritious and balanced diet, including fresh fruits and vegetables"; (6) maintain "[s]afe indoor air quality"; (7) have "heating and air conditioning equipment that can be adjusted by room or area"; and (8) operate an "infection control program." Wash. Rev. Code § 70.395.040.

Second, residential treatment facilities in Washington are "twenty-four hour . . . facilities" that "provid[e] health care services to persons with mental disorders or substance abuse disorders." Wash. Admin. Code § 246-337-001 (2023). These facilities are required under Washington law to maintain an effective "infection control program," *id.* § 246-337-060; to serve three nutritious meals per day, with modifications appropriate to medical conditions and religious preferences, *id.* § 246-337-111; to provide laundry facilities that are clean and in good repair, *id.* § 246-337-112; to provide housing that is in good repair, with "heating, ventilation, and air conditioning," *id.* § 246-337-120; to provide bathing and toilet areas with soap and toilet paper, *id.* § 246-337-124; to provide laundry facilities, *id.* § 246-

337-128; to provide heating and air conditioning that can maintain "interior temperatures between sixty-five degrees Fahrenheit and seventy-eight degrees Fahrenheit year-round," *id.* § 246-337-135; and to maintain the facility in a clean and sanitary condition, *id.* § 246-337-146.

Third, involuntary civil commitment facilities in Washington are facilities where individuals are confined against their will despite the fact that they have not been convicted of a crime. Such facilities include, for example, mental health hospitals where mentally ill individuals are civilly committed under Washington's Involuntary Treatment Act. Wash. Rev. Code §§ 71.05.010–71.05.950. These facilities are required under Washington law to "[e]stablish and implement an effective hospital-wide infection control program," Wash. Admin. Code § 246-322-100 (2024); to provide a safe and clean environment, including a ventilation system and a "heating system operated and maintained to sustain a comfortable temperature," *id.* § 246-322-120; to provide sleeping rooms with adequate space and bed linens, *id.* § 246-322-140; to provide adequate toilet fixtures and rooms, as well as adequate sink and bathing fixtures, *id.* § 246-322-160; to provide three well-balanced and nourishing meals per day, *id.* § 246-322-230; and to provide laundry and linen services, *id.* § 246-322-240.

We have held that there is no "de minimis exception to the doctrine of intergovernmental immunity." *California*, 921 F.3d at 883. "*Any* economic burden that is discriminatorily imposed on the federal government is unlawful." *Id.* at 883–84 (emphasis in original). With GEO's challenge in its current posture—before DOH has promulgated any rules implementing Section 2—the question before us is whether there is a likelihood that DOH

will adopt rules under Section 2 that are different from the requirements applicable to the two types of civil detention facilities.

GEO's discrimination argument in its brief is based almost entirely on a comparison of the requirements imposed by Section 2 with the requirements Washington imposes on its prisons. GEO argues only in passing that Section 2 is discriminatory based on a comparison of its requirements to the requirements Washington imposes on the two types of civil detention facilities. The only requirements of Section 2 to which GEO has specifically objected in its brief are three requirements discussed in the portion of its brief dedicated to its argument about Article III case or controversy. Generously construed, GEO's argument is that these three requirements are different from the comparable requirements imposed on the civil detention facilities, and that they are therefore discriminatory.

Though it is a close question, we conclude that the best course of action is not to decide ourselves at this point whether Washington regulates the conditions of confinement at the NWIPC differently from the way it regulates the conditions of confinement in the two civil detention facilities. The best course of action is, rather, to allow the district court to do so in the first instance. That court should make the comparison between the requirements imposed on the NWIPC by Section 2 of HB 1470, as amended by HB 1232, and the requirements imposed by Washington law on the two types of civil detention facilities. Because the district court concluded that the appropriate comparator is Washington's prisons, it made no attempt to make that comparison with respect to the requirements imposed by Section 2; and, because of its recent enactment, the district court of course could not have included in such a

comparison the requirements of HB 1232.  We remand to allow the district court to make that comparison.

### (b)  Section 6 of HB 1470 and Section 4 of HB 1232

As noted above, Section 6 of HB 1470 provides that "[a]ny person who fails to comply" with HB 1470 "may be subject to a civil penalty in an amount of not more than $1,000 per violation per day." *Id.* § 70.395.080(1).  Section 4 of HB 1232 provides a "civil fine of up to $10,000 per violation, not to exceed a total fine of $1,000,000, on a private detention facility" under certain circumstances. H.B. 1232 § 4.

For two reasons, Washington argues in its brief that Section 6 is not a discriminatory burden.  First, DOH possesses the "authority to impose fines on other facilities for non-compliance with its regulations."  For example, Wash. Admin. Code § 246-322-025(6) (2023) allows "civil fines on a psychiatric hospital . . . of up to $10,000 per violation."  Second, Washington contends that "other facilities are subject to a much more stringent enforcement mechanism: DOH's authority to deny or suspend their license or ability to operate at all."  Further, Wash. Admin. Code § 246-337-021(6) (2023) allows DOH to "revoke" a license of a residential treatment facility that "[f]ail[s] to comply" with DOH regulations.  Washington therefore argues that the NWIPC is thus "*better off*" than the civil detention facilities to which we compare it. *See Washington*, 460 U.S. at 541–42 (emphasis in original).

GEO has made no argument to the contrary.  In its responding brief, GEO describes the penalty authorized in Section 6, but it does not argue that it is discriminatory. However, GEO has not yet had an opportunity to make an

argument that Section 6, combined with Section 4 of HB 1232, is discriminatory.

The district court struck down Section 6 as a natural corollary of its decision that the requirements of Section 2 were unconstitutional.  But that decision was, of course, premised on a comparison to Washington's prisons rather than the private civil detention facilities to which we now hold are the appropriate comparators.  We vacate the district court's decision and remand to allow that court to make that comparison in the first instance.

### b.  Preemption

The district court held that Sections 2, 3 and 6 of HB 1470 are not preempted by federal law.  Of course, that court had no opportunity to address HB 1232.  However, given the relatively small changes effectuated by HB 1232, we conclude that its preemption analysis would not have been affected.

Federal law preempts state law when Congress has occupied the "field," enacting a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Federal law also preempts state law when a party cannot comply with both federal and state law, or when state law poses an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (citation omitted).

There is a presumption against preemption "when a state regulates in an area of historic state power."  *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (citation

omitted).    Once triggered, the presumption against preemption applies "even if the law 'touch[es] on' an area of significant federal presence."  *Id.* (alteration in original) (quoting *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 n.5 (9th Cir. 2016)); *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) ("[T]he Court has never held that every state enactment which in any way deals with [noncitizens] is a regulation of immigration and thus per se preempted by this constitutional power."); *Puente Ariz.*, 821 F.3d at 1104.  To overcome the presumption against preemption, the challenging party must show a "clear and manifest purpose of Congress" to preempt state law.  *Arizona v. United States*, 567 U.S. 387, 400 (2012) (internal citations omitted).

### i.  Field Preemption

GEO points to the constitutional authority of the federal government to regulate immigration and argues that many state-imposed immigration-related measures, including those at issue here, are preempted by federal law.  We rejected a similar argument in *California*, where California law authorized inspection, *inter alia*, of federal detention facilities holding noncitizens "for purposes of civil immigration proceedings." *California*, 921 F.3d at 875.  The inspections included review of "conditions of confinement" and "standard of care."  *Id.* at 876.  We noted that the government did not "dispute that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders," and held that the government had failed to "demonstrate *any* intent, let alone 'clear and manifest,' that Congress intended to supersede this authority."  *Id.* (emphasis in original); *see also Newsom*, 40 F.4th at 766 (emphasizing a state's "historic" powers in this domain).  Similarly, we see no indication that Congress has demonstrated any intent, let alone a clear and

manifest intent, to preempt Sections 2, 3 and 6 of HB 1470 and relevant portions of HB 1232.

### ii. Obstacle Preemption

GEO contends in its brief that "HB 1470 presents an unconstitutional obstacle to the accomplishment of the government's carefully crafted standards for the conditions of alien detention."

As noted above, to prevail in its argument, GEO must overcome the presumption against preemption. *See California*, 921 F.3d 886. HB 1470 and HB 1232 do not apply to the United States. They apply to GEO. Nothing in Sections 2, 3 and 6 frustrates the federal government's ability to detain individuals at the NWIPC. Nor do these sections prevent GEO from accomplishing any task that has been required by the federal government—especially when its own contract with ICE contemplates more stringent state requirements in the first place. We therefore conclude that GEO has not established that these statutes constitute obstacle preemption.

### B.  Section 5

Section 5 of HB 1470 provides to a "detained person" a private cause of action for monetary and injunctive relief for a violation of HB 1470, including the requirements set forth in Section 2. Wash. Rev. Code § 70.395.070. Section 5 provides no cause of action to the Attorney General or Governor. The district court granted a preliminary injunction against the enforcement of Section 5, holding that it violates the doctrine of intergovernmental immunity.

In *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), a provision of a Texas statute, SB 8, allowed private citizens to enforce the law's prohibition on abortions through

the filing of a civil suit. *Id.* Plaintiffs filed suit against several defendants, including the Texas Attorney General, seeking an injunction against enforcement of the statute. *Id.* The Supreme Court held that the Attorney General was not a proper defendant as to SB 8 because "petitioners d[id] not direct this Court to any enforcement authority the attorney general possessed in connection with [SB] 8 that a federal court might enjoin him from exercising." *Id.* at 43. Like SB 8, Section 5 of HB 1470 does not grant "any enforcement authority" to the Attorney General or the Governor. *See id.* Thus, the Attorney General and the Governor are not proper defendants as to Section 5.

Because Section 5 provides no cause of action against either the Attorney General or Governor, we conclude that the district court erred in reaching the merits of GEO's challenge to this section. Rather than enjoining enforcement of Section 5 by the Attorney General and the Governor, the district court should have dismissed this portion of GEO's suit.

## Conclusion

We vacate the district court's grant of a preliminary injunction against Sections 2, 3, 5 and 6 of HB 1470. We grant in part the motion to remand (Dkt. No. 63) to the district court for further proceedings consistent with this opinion.

**VACATED and REMANDED.**